UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| METROPOLITAN LIFE INSURANCE COMPANY,<br><br>    Plaintiff,<br><br>v.<br><br>BEATRICE MCDONALD and SARAH MCDONALD RAY,<br><br>    Defendants. | Case No. 2:17-cv-11912<br>Honorable Laurie J. Michelson |

**OPINION AND ORDER
GRANTING RAY'S MOTION FOR SUMMARY JUDGMENT [23],
DENYING MCDONALD'S MOTION FOR SUMMARY JUDGMENT [25] AND
DENYING MCDONALD'S MOTION TO FILE A CROSS CLAIM [24]**

The central question in this case can be stated briefly: Is Sarah L. McDonald Ray or Beatrice McDonald entitled to the proceeds from Leon McDonald's life-insurance policy? The answer is brief too: Sarah L. McDonald Ray. The justification for this answer, however, is not so brief.

For over 20 years, Leon McDonald and Sarah L. McDonald Ray were married. In February 1986, the two divorced. (*See* ECF No. 23, PageID.146.) As part of their divorce, Leon and Sarah entered into a Property Settlement Agreement ("Divorce Agreement"). The Divorce Agreement stated, "The husband [Leon McDonald] shall name the wife [Sarah L. McDonald] as the primary beneficiary of the husband's General Motors Corporation life insurance policy, and shall name as equal contingent beneficiaries thereof the parties' daughter [and the parties' two grandchildren]. The husband shall continue to have the above persons as his primary and contingent beneficiaries, unless such persons agree to a change." (ECF No. 23, PageID.153.)

Sometime before his divorce from Sarah, Leon began a relationship with Beatrice McDonald. In time, the two would marry. Despite the Divorce Agreement, Leon eventually named Beatrice as the primary beneficiary of his General Motors life-insurance policy. (ECF No. 1, PageID.31.) This occurred at least by 2003. (*See* ECF No. 1, PageID.31.) In 2010, Leon completed another change-of-beneficiary form, keeping Beatrice as the primary beneficiary but adding his daughter (from his marriage with Sarah) as a contingent beneficiary. (ECF No. 1, PageID.27.)

In July 2016, Leon died. MetLife, the administrator of General Motors' life-insurance plan, received competing claims to the proceeds of Leon's life-insurance policy: one from Sarah, one from Beatrice. So MetLife filed this interpleader lawsuit asking the Court to sort it out.

In their respective motions for summary judgment, Sarah and Beatrice take expected positions: Sarah says the Divorce Agreement trumps the beneficiary-designation forms; Beatrice says just the opposite.

Who is correct largely depends on the provisions of the Employee Retirement Income Security Act of 1974 (ERISA). ERISA regulates employee-benefit plans, including the General Motors life-insurance plan. (*See* ECF No. 1, PageID.66.) Speaking generally, ERISA prohibits assigning or "alienat[ing]" the proceeds of a life-insurance policy to anyone but the named beneficiary. *See* 29 U.S.C. § 1056(d)(1). And, still speaking generally, ERISA's provisions preempt or, more precisely, "supersede any and all State laws insofar as they . . . relate to any employee benefit plan" governed by ERISA. 29 U.S.C. § 1144(a). Because the Divorce Agreement was incorporated into the divorce judgment entered by the state court, and because it attempts to dictate the beneficiaries of an ERISA-governed policy, it is a state law that relates to an employee benefit plan. *Cf. Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 147 (2001). So it seems that the Divorce Agreement runs into ERISA's anti-alienation provision and its preemption provision.

And if that were so, it seems that Beatrice should receive the life-insurance proceeds. 29 U.S.C. § 1104(a)(1)(D) (providing that plan administrator is to "discharge his duties . . . in accordance with the documents and instruments governing the plan").

But that is, as noted, "speaking generally." And in this case, it is necessary to be more specific. "In 1984, Congress amended ERISA to provide greater protection for spouses and dependents after a divorce." *Sun Life Assurance Co. of Canada v. Jackson*, 877 F.3d 698, 700 (6th Cir. 2017). In particular, Congress exempted qualified domestic relations orders (or "QDROs") from ERISA's anti-alienation and preemption provisions. *See* 29 U.S.C. § 1144(b)(7); *Boggs v. Boggs*, 520 U.S. 833, 846–47 (1997). So if Leon and Sarah's Divorce Agreement is a QDRO, then the Divorce Agreement would not run afoul of ERISA's anti-alienation provision. *Boggs*, 520 U.S. at 846–47. Nor would the Divorce Agreement be preempted by ERISA. *Id.*

So is the Divorce Agreement a QDRO? To answer that question, the Court must first decide whether the Divorce Agreement is a domestic relations order or "DRO." That is because to be a *qualified* DRO, the Divorce Agreement must first be a DRO. *See* 29 U.S.C. § 1056(d)(3)(B)(i). Fortunately, it is readily apparent that the Divorce Agreement is a DRO. DROs include "approval[s] of a property settlement agreement" that (1) "relate[] to the provision of . . . marital property rights to a spouse" or "former spouse" and (2) are "made pursuant to a State domestic relations law." 29 U.S.C. § 1056(d)(3)(B)(ii). The Divorce Agreement is a "property settlement agreement" that was incorporated by reference into Leon and Sarah's judgment of divorce which was pursuant to Florida domestic relations law. (ECF No. 12, PageID.101.) So the Divorce Agreement is a DRO.

Now to the qualified part. To be a QDRO, the Divorce Agreement must meet additional requirements. One set of requirements are obviously satisfied: the Divorce Agreement does not

require MetLife (or any other administrator of the General Motors plan) to provide a benefit that is not part of the plan, it does not divert funds from a beneficiary named in another QDRO, and it does not require MetLife "to provide increased benefits." *See* 29 U.S.C. § 1056(d)(3)(D). And the Divorce Agreement "creates or recognizes the existence of an alternate payee's right to . . . receive all or a portion of the benefits payable." 29 U.S.C. 1056(d)(3)(B)(i). (An "alternate payee" is simply a "spouse, former spouse, child, or other dependent of a participant who is recognized by a domestic relations order as having a right to receive all, or a portion of, the benefits payable under a plan with respect to such participant." 29 U.S.C. § 1056(d)(3)(K).)

There are five more requirements for the Divorce Agreement to be a QDRO. *See* 29 U.S.C. § 1056(d)(3)(C). In particular, the Divorce Agreement must "clearly specif[y]" (more on what this means in moment) the following: (1) "the name and the last known mailing address (if any) of the participant"; (2) "the name and mailing address of each alternate payee covered by the order," (3) "the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined," (4) "the number of payments or period to which such order applies," and (5) "each plan to which such order applies." 29 U.S.C. § 1056(d)(3)(C)(i)–(iv).

As noted, the Divorce Agreement must "clearly specif[y]" the five items referenced in § 1056(d)(3)(C). When Congress amended ERISA in 1984 to remove QDROs from the ambit of preemption, it gave greater protection to "spouses and dependents by allowing a state order, outside of the four corners of the employee benefit plan, to modify the distribution of the plan's benefits." *Sun Life Assurance Co. of Canada v. Jackson*, 877 F.3d 698, 702 (6th Cir. 2017). But Congress had to balance that "greater flexibility" for family members against a plan administrator's obligations under ERISA. And § 1056(d)(3)(C) aimed to do that by "requiring the

4

[state court] order to be clear about the identity of the alternate payee and the benefits to be redirected." *Jackson*, 877 F.3d at 702. So to be a QDRO, the Divorce Agreement must "clearly specify" the five items referenced in § 1056(d)(3)(C). That said, clearly specifying something does not require "Simon Says rigidity" or "magic words"; "[o]ne may 'clearly specify' something by implication or inference so long as the meaning is definite." *Jackson*, 877 F.3d at 701.

So does the Divorce Agreement "clearly specify" the five items in § 1056(d)(3)(C)? Take them one by one.

*One*. The Divorce Agreement has Leon's full name, "Leon R. McDonald." (ECF No. 23, PageID.147.) It does not explicitly recite his last known mailing address, but it does say that he and Sarah owned a "marital home" at "17933 East Road, Hudson, Florida" and that, at the time of the divorce, that home was in the process of being sold. (ECF No. 23, PageID.149.) Thus, at the time of the divorce, the administrator of General Motors' life-insurance plan could contact Leon at 17933 East Road. And, as noted, ease of administration is the point of the § 1056(d)(3)(C) requirements. *See Jackson*, 877 F.3d at 702; *Hamilton v. Washington State Plumbing & Pipefitting Indus. Pension Plan*, 433 F.3d 1091, 1097 (9th Cir. 2006) (providing that the "pivotal question" is whether the marriage dissolution order "clearly contains the information specified in the statute that a plan administrator would need to make an informed decision" (internal quotation marks omitted)). So the Court finds that the Divorce Agreement "clearly specifies" "the name and the last known mailing address (if any) of the participant." 29 U.S.C. § 1056(d)(3)(C)(i).

*Two*. The Divorce Agreement also lists Sarah's full name at the time, "Sarah L. McDonald," and, as just noted, includes the address of the "marital home." (ECF No. 23, PageID.147, 149.) The Divorce Agreement also states that until the martial home is sold, Sarah would continue to live there. (ECF No. 23, PageID.149.) True, the Divorce Agreement does not

provide the addresses of the three contingent beneficiaries; but that contingency clause is not at issue in this litigation and so any difficulty MetLife might have had in locating Leon's child or two grandchildren is purely hypothetical. So the Court finds that, for purposes of resolving this case, the Divorce Agreement "clearly specifies" "the name and mailing address of each alternate payee covered by the order." 29 U.S.C. § 1056(d)(3)(C)(i).

*Three*. The Divorce Agreement lists Sarah as the sole, primary beneficiary. So it "clearly specifies" "the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined." 29 U.S.C. § 1056(d)(3)(C)(ii).

*Four*. Because it is a life-insurance policy, and because Sarah is the sole, primary beneficiary on the policy, the Divorce Agreement by clear implication provides "the number of payments": one. 29 U.S.C. § 1056(d)(3)(C)(iii). Likewise, had Sarah died before Leon, one payment of equal share would be made to the surviving contingent beneficiaries.

*Five.* Although she made no argument about the other four § 1056(d)(3)(C) requirements, Beatrice argues that the Divorce Agreement fails to clearly specify "each plan to which such order applies," 29 U.S.C. § 1056(d)(3)(C)(iv). (*See* ECF No. 25, PageID.170–171.) Beatrice says, "[the Divorce Agreement] refers to the 'husband's General Motors Corporation life insurance policy.' Which one? According to [Sarah,] . . . Leon had '5 or 6 life insurance policies.'" (ECF No. 25, PageID.171.) It is true that, according to Sarah, Leon had other life-insurance policies. But there is nothing indicating that any of those polices were through General Motors. Nor is there anything indicating that any of those policies existed in 1985 when Leon and Sarah divorced. Indeed, the Divorce Agreement only explicitly references two policies: the one at issue in this case and a "National Service Life Insurance Policy." (ECF No. 23, PageID.153.) In all then, the Court finds

that the Divorce Agreement clearly specifies "each plan to which such order applies." 29 U.S.C. § 1056(d)(3)(C)(iv).

So the Divorce Agreement is a QDRO. And that means that neither ERISA's anti-alienation provision nor preemption provision apply to the Divorce Agreement. *Boggs v. Boggs*, 520 U.S. 833, 846–47 (1997). And apart from those provisions of ERISA, the Court sees no reason why the Divorce Agreement should not be given effect. And that includes this clear language: "The husband [Leon McDonald] shall name the wife [Sarah L. McDonald] as the primary beneficiary of the husband's General Motors Corporation life insurance policy . . . . The husband shall continue to have the above person[] as his primary . . . beneficiar[y], unless such person[] agree[s] to a change." (ECF No. 23, PageID.153.) Indeed, Florida courts have found that similar language divests the husband of his ownership interest in the policy and thus the husband lacks the property right necessary to designate a new beneficiary. *See Primerica Life Ins. Co. v. Moore*, No. 8:07-CV-1687-TTGW, 2008 WL 1886032, at *3 (M.D. Fla. Apr. 28, 2008); *Metro. Life Ins. Co. v. Williams*, 82 F. Supp. 2d 1346, 1353 (M.D. Fla. 1999).

That would seem to be the end of this case; but Beatrice argues that the language just quoted is not enforceable under Florida law. One case could be read as suggesting that once a court determines that an order is a QDRO, it need not address arguments based on state law. *See Hartford Life & Acc. Ins. Co. v. Premium Escrow Servs., Inc.*, No. 04-1768-PA, 2005 WL 6217077, at *11 (D. Or. Aug. 3, 2005). But *Hartford Life* only specifically dealt with an innocent-purchaser defense to a QDRO (the defendant claimed that it had bought the life-insurance policy without knowledge of a conflicting QDRO). *See id.* And other cases indicate that a QDRO can be challenged as invalid or unenforceable under state law. *See Metro. Life Ins. Co. v. Williams*, 82 F. Supp. 2d 1346, 1353 (M.D. Fla. 1999); *Aetna Life Ins. Co. v. Hager*, 930 F. Supp. 343, 347 (E.D. Wis. 1996). This is

7

because to be a QDRO, the order must be a DRO; and a DRO is, by definition, an order "made pursuant to a State domestic relations law," 29 U.S.C. § 1056(d)(3)(B)(ii). So if the order is not viable under "State domestic relations law," it makes sense for a party to be able to argue that. Thus, the Court will engage Beatrice's state-law argument.

Beatrice argues that under Florida law there are only three situations where a court deciding a divorce can order that one spouse be maintained as the beneficiary of the other's life-insurance policy. (ECF No. 25, PageID.172.) In support of this claim, Beatrice quotes the following passage from *Kearley v. Kearley*, 745 So. 2d 987, 989 (Fla. Dist. Ct. App. 1999):

> "First, the cash surrender value of life insurance purchased during the marriage can be treated as a marital asset without restricting the owner's future ability to select beneficiaries.
>
> "Second, by compelling the policy's owner to select the former spouse as beneficiary, the trial court can use the policy *as security to indemnify the former spouse for any unpaid obligations arising from the final judgment, typically for alimony or child support* due at the time the payor spouse dies.
>
> "Third, the trial court can compel the owner to select the former spouse as beneficiary in order to minimize future economic harm to the surviving family upon the untimely death of a spouse *who paid alimony or child support* during his or her life."

(ECF No. 25, PageID.172 (emphasis added) (paragraphing altered).) Beatrice—stressing that the Divorce Agreement awarded neither alimony nor child support—says, "None of these permissible reasons exist in this case." (ECF No. 25, PageID.172.)

The Court is unpersuaded that Florida law prevents divorcing spouses from agreeing to maintain one spouse as the primary beneficiary of the other's life-insurance policy. Beatrice's argument overlooks the fact that the passage just quoted is prefaced with the following: "Trial courts *can* approach life insurance from *at least* three different perspectives." *Kearley*, 745 So. 2d at 989 (emphasis added). That is not only permissive language but also non-exhaustive language.

8

Worse, Beatrice (or, rather, her counsel) overlooks the fact that the quoted passage comes from a non-binding concurring opinion. *Kearley*, 745 So. 2d at 989 (Altenbernd, J., concurring). Moreover, there is case law that is contrary to Beatrice's "only three ways" position: "a parent or spouse can voluntarily agree to name and maintain another person . . . as an insured under a life insurance policy. *Such an agreement need not be limited to security for a support obligation* and can constitute a binding and unconditional conveyance of the benefits payable under such policy." *Cantrell v. Home Life Ins. Co.*, 524 So. 2d 1063, 1064 (Fla. Dist. Ct. App. 1988) (emphasis added).

In short then, the Court finds that Sarah is entitled to the proceeds of Leon's GM life-insurance policy.

That leaves one issue to address. Beatrice argues that if Sarah is awarded the proceeds from Leon's life-insurance policy, then she should at least be awarded "enough of the proceeds" to cover Leon's funeral expenses. (ECF No. 27, PageID.181.) Beatrice paid the funeral home "$4,587 in full and final satisfaction of the funeral home's bill." (ECF No. 24, PageID.164.) Beatrice says she paid "believ[ing] that she was the beneficiary to the life insurance policy in question and would recover the sum she paid the funeral bill from the proceeds." (*Id.*) Thus, argues Beatrice, "it would be inequitable for Sarah Ray to retain all of the life insurance proceeds in question." (ECF No. 24, PageID.164.) So Beatrice asks for leave to file a cross-claim against Sarah (ECF No. 24) and argues that if Sarah is awarded the proceeds, "the Court must impose a constructive trust over the life insurance proceeds deposited with the Court in the amount of $4,587." (ECF No. 24, PageID.164.)

The Court declines to do so. Under both Florida and Michigan law, a constructive trust is an equitable remedy. *Brown v. Poole*, 261 So. 3d 708, 710 (Fla. Dist. Ct. App. 2018) ("Courts impose constructive trusts either upon property acquired by fraud, or when it is 'against equity'

9

that someone who acquired property without fraud should continue to retain possession."); *Cassidy v. Cassidy*, 899 N.W.2d 65, 87 (Mich. Ct. App. 2017) ("A constructive trust may be imposed where such trust is necessary to do equity or to prevent unjust enrichment."). Here there is nothing inequitable about Sarah receiving all the proceeds from the GM policy. When Beatrice paid for Leon's funeral expenses, she may have believed that she was entitled to the proceeds from the GM policy. But she knew—or should have known—that the issue was not free from doubt. About two weeks before Beatrice paid the funeral home, MetLife mailed her (and Sarah) a letter stating that Sarah had laid claim to the benefits. (*Compare* ECF No. 1, PageID.66 (September 1, 2016), *with* ECF No. 5, PageID.77–78 (September 14, 2016).) And the letter quoted the language from the Divorce Agreement requiring Leon to name and maintain Sarah as the beneficiary. (ECF No. 1, PageID.66.) So it seems that in paying the funeral home, Beatrice took the risk that she would not be awarded the proceeds of the GM policy. Moreover, Beatrice, Leon's wife at the time of his death, has not shown that she would not have paid the funeral expenses had there been no GM policy (or if MetLife had decided that Sarah should get the proceeds), that Sarah, who had divorced Leon three decades earlier, had given any indication that she would pay for some of Leon's funeral, or that Sarah attended the funeral or in any way benefitted from it. Further, Sarah claims, and Beatrice has not denied, that Beatrice received proceeds from Leon's other life-insurance policies; Beatrice has given no reason why the funeral expenses should not be paid from the proceeds from those policies. In all, equity does not favor Beatrice.

For the reasons given, Sarah's motion for summary judgment (ECF No. 23) is GRANTED, Beatrice's (ECF No. 25) is DENIED, and Beatrice's motion for leave to file a cross-claim (ECF No. 24) is DENIED.

The Clerk of Court is ORDERED to disburse, forthwith, $11,078.90 plus 100% of any applicable interest being held in the Registry of the Court to Sarah L. McDonald Ray, made payable to "Sarah L. McDonald Ray" at 13344A Via Vesta, Delray Beach, FL 33484.

SO ORDERED.

                                            s/Laurie J. Michelson
                                            LAURIE J. MICHELSON
                                            UNITED STATES DISTRICT JUDGE

Date: June 10, 2019

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on June 10, 2019.

                                            s/William Barkholz
                                            Case Manager to
                                            Honorable Laurie J. Michelson